17759

Clyde Forrest STRAWHORNE, Respondent, v. ATLANTIC COAST LIFE INSURANCE COMPANY, Appellant

(119 S. E. (2d) 101)

*Messrs. Roddey & Sumwalt,* of Rock Hill, *for Appellant,*

*Messrs. Hayes & Hayes,* of Rock Hill, *for Respondent,*

March 24, 1961.

TAYLOR, Justice.

Appellant issued its policy of life insurance to the insured, Rebecca W. Strawhorne, the wife of the Respondent, on December 7, 1959, wherein it agreed to pay at her death benefits in the amount of $2,000.00 with double indemnity pro-

visions for accidental death, the policy containing the following limitation with reference to death benefits:

"The liability of the Company hereunder shall be limited under the following conditions to a return of the premiums paid on the policy: * * * (2) If the insured shall die by his or her own hands, whether sane or insane, for the first two years after this policy is in force."

The policy contains limitations applicable only to the double indemnity features of the policy, with which we are not here concerned, as all issues with reference to the liability of the Appellant by way of double indemnity were resolved by the Court during the trial favorably to the Appellant, from which no appeal has been taken.

The insured died as a result of a gunshot wound on February 23, 1960, while the policy was in full force and effect. This action was instituted by the Respondent, the husband of the deceased, as beneficiary, for the recovery of the amount allegedly due under the policy. The Appellant denied liability for any amount, except for a return of the premiums paid, alleging that the insured came to her death by her own hands and its liability was, therefore, limited, under the above quoted policy provision.

The case was tried and resulted in a verdict by the jury for the Respondent in the amount of $2,000.00. During the trial timely motions were made by Appellant for a nonsuit and directed verdict, which were denied. The appeal to this Court is from such rulings by the trial Court and presents only the question of whether or not all of the evidence, considered in a light most favorable to the Appellant, is susceptible of any reasonable hypothesis other than the insured came to her death by her own hands. It is conceded that the death of the insured occurred within the first two policy years.

While the policy provision limits liability to a return of the premiums if the insured shall die "by his or her own hands," the phrase is synonymous with "sui-

cide" and was so regarded and construed in the trial of this case. See: *Gibson v. Reliance Life Insurance Company of Pittsburg, Pennsylvania*, 172 S. C. 94, 172 S. E. 772; 45 C. J. S., Insurance, § 844, p. 923.

Where the defense of suicide is interposed by the insurer to defeat recovery under a policy of insurance, the burden is upon the insurer to prove the fact of suicide by the preponderance of the evidence. It is true that where death by violent injury has occurred, unexplained, there is a presumption against suicide, but this is a presumption of law and not of fact. When evidence as to the fact of suicide is introduced, the presumption against suicide vanishes and the question must be resolved upon the evidence. *McMillan v. General American Life Insurance Company*, 194 S. C. 146, 9 S. E. (2d) 562.

There is no substantial dispute as to the facts and circumstances surrounding the death of the insured. She was a young woman about 20 years of age and had been married to the Respondent for about 2 years. They lived in an apartment adjoining that of Respondent's mother. The two apartments were connected by a door between the bedrooms and they shared a common bath with his mother. On the evening of February 23, 1960, Respondent returned to the apartment from work, changed clothes and left to go to the home of one Florence Fincher. When he left the apartment, the insured and his mother were sitting in the living room. Shortly thereafter, the insured went into the apartment of Respondent's mother to take a bath, and the mother went to her own living room to watch television. The mother heard the water running in the bathtub and later heard the insured go back into her own apartment. Within a few minutes, Respondent's mother heard a noise as though a heavy object had fallen. She heard no gun shot or other noise. Upon going into the insured's apartment, she found the insured lying on her back on the floor in the living room with a bullet wound in her chest, and a .32 automatic pistol lying just to the right of her right foot. A flower pot on a stand had been

broken but nothing else had been disturbed in the room. The insured was dressed in pajamas, on which all of the buttons were fastened. The bullet wound penetrated the chest just to the right of the midline of the breastbone, passed through the body ranging downward and struck a small flower pot on a stand. There was a hole in the back of the pajamas where the bullet left the body, but there was no hole in the front of the pajamas. Powder burns were around the wound, indicating that the gun was fired at very close range. The pistol was an automatic equipped with a "lemon squeezer safety" device on the rear of the butt, and it would not fire unless this was pushed in.

The record reveals no evidence of an illegal entry into the insured's apartment and nothing to indicate that a stranger had been in the room.

There is testimony from the Respondent and his mother that the Respondent and the insured were getting along well together and that the insured appeared happy. However, the record shows that three days before her death, the insured packed some of her things and went to see a sister. She did not tell the Respondent that she was leaving or where she was going. She remained away two days and nights during which time the Respondent did not know where she was but made no attempt to locate her. Upon arrival at her sister's home, the insured was upset and crying and said that she did not know whether her husband was "two-timing" her or not. The insured returned to the apartment after an absence of two days and nights without any inquiry from the Respondent as to where she had been or explanation on her part as to her absence. On the night of the insured's death, the Respondent, upon his return from work, found the .32 caliber automatic pistol on the table in their living room. The pistol had been given the deceased by her mother approximately eighteen months previously and was customarily kept in the bottom of a wardrobe. It was examined by Respondent and found to contain a loaded clip of cartridges with the chamber of the barrel empty. Upon inquiry of the

insured as to the presence of the pistol on the table, she said that she had it because of the Negroes coming along the street. The pistol was returned to the table by the Respondent and is the same weapon found by the insured's body after her death. On the night that his wife met her death, the Respondent went to the house of one Florence Fincher to "play the guitar," where he met some friends with whom he went to ride. Upon his return to the apartment, his wife was dead and her body had been removed to the funeral home.

■ The only reasonable inference to be drawn from the circumstances is that the insured committed suicide.

The insured and the Respondent were having domestic trouble to the extent, at least, of arousing in the mind of insured doubts about the Respondent's fidelity. The absence of a bullet hole in the front of her pajamas, the presence of powder burns, and the failure of Respondent's mother to hear the discharge of the pistol, although nearby, indicates conclusively that the muzzle of the pistol at the time of discharge was beneath the pajamas and in such close contact with the body as to not only leave powder burns but also muffle the sound of the shot. The pistol was equipped with a safety device which required pressure on the butt of the gun before it would fire. When last examined by the Respondent, there was no cartridge in the barrel of the gun. The range downward of the bullet negates any theory that the weapon was fired by being dropped. For the pistol to fire with the attendant results, it was necessary that its muzzle be placed under the pajamas in such close proximity to the body as to muffle the sound of its discharge, and that the trigger be pulled while pressure was applied to the butt of the gun. These circumstances do not indicate accident, but on the contrary, all of the facts and circumstances lead to but one reasonable conclusion, that the insured came to her death by her own hands. Surmise and speculation might suggest other theories as to the cause of death, but we have repeatedly held that verdicts cannot be predicated upon such basis.

...The judgment is reversed and the case is remanded with instruction to enter judgment for the plaintiff in the amount of the premiums paid, and for judgment for the defendant in all other amounts claimed under the policy sued on.

Reversed.

OXNER, LEGGE and Moss, JJ., concur.